Thank you, Your Honors. Good morning. May it please the Court, my name is Rochelle Fortier-Wadivia, and I'm an attorney who represents Mr. Vijay Kumar in these proceedings. Mr. Kumar is present in the courtroom today. The position of the petitioner in this case is really quite simple, Your Honor, and that is that we believe that under the standard of review that is before the Court, that the asylum application and the withholding and care applications of the petitioner, and that there's a lack of substantial evidence in the record to support the findings of fact and the credibility finding by the immigration judge. One important note. Actually, before I proceed, Your Honor, I wanted to make a correction in the record that was just in the facts in the brief, and I believe it's in the brief also of the government. It's in the petitioner's brief on page 4, the second line, where there is a line that says that the petitioner appeared at a master calendar hearing on February 18, 2002, while detained, and there was a bond entered. That is incorrect and should be deleted from the record. The rest of the paragraph is correct, and you can see that sequentially that's out of date, the 2002 preceding the 2000, and for some reason it's both in the petitioner's brief and the answering brief. Well, let me ask you a few questions. When Mr. Kumar came to the United States with his wife, he got in touch with an asylum attorney from the Fijian organization up there in the Bay Area, right? He's in part, Your Honor, that is correct. Yes, he did contact Mr. Albert Villela. However, Mr. Villela is not an attorney. Well, he thought he was an attorney. He believed he was an attorney. He believed he was an attorney. He did, yes. And Mr. Villela was certified by the immigration service as a representative. Is that right? I wasn't the attorney representing the Respondent at that time. I'm not sure at all of any of Mr. Villela's credentials before the board or before this Court, for that matter, or before the immigration court. However, Okay. Then he went to, well, let's take it as a given that he was certified, because there's a list of certified representatives. I have that list, and he's on that list. All right? And then when Mr. Kumar saw the, what's the gentleman's name again? Villela? Mr. Albert Villela. Villela, yes, up north. He paid him some money. This is correct. And the man told him, well, you come back in about six months. That's correct, Your Honor. And then he came back, I believe, in six months. And the guy said, well, you come back later. And he came back later. And then he signed an application for asylum. And that application, I've got the date here. Correct. It was within that, when he signed it, it was within that year period. It was, Your Honor. It was in September. And he signed a check that was in that year period. That's correct, Your Honor. And that asylum application was not filed for another six months. According to the record, that is correct, Your Honor. Okay. And then he got down here to Los Angeles, and he went to the, what's the place called, a Khmer, what's the organization called down here? I believe it was the Khmer Humanitarian Organization. Khmer Humanitarian Organization. All right. He went down to see them. Is that right? It's my understanding, Your Honor. Well, were you referred to him by this organization? No, I was not, Your Honor. I'm not familiar with that organization at all. You're not familiar with that organization? Not at all. Nor Mr. Valela. I'm only aware of Mr. Valela's reputation because I represent many clients from the Fijialians, Indo-Fijian clients. From the Indian. I believe that I was referred by, Mr. Kumar was referred by another family friend. Another family friend. In this case, I had prevailed. All right. Now, when he went to the Khmer organization, he saw another person he thought was an attorney. Is that right? My understanding, Your Honor, is that I've seen that there were several attorneys whose names are in the record. Well, and then he had his hearing before the IJ. That's right. And have you spoken with that so-called attorney? I have not, Your Honor. Do you know if that attorney prepared him for his testimony before he appeared before the IJ? I do not, Your Honor. And, of course, by then, the application was late under the Real ID Act. Well, I believe, Your Honor, though, that Real ID wasn't really operative at that time. This was the filing of the application was in 2000, and the Real ID, of course, was passed in May of 2005. Well, in other words, you were aware that when his application was filed by the Indo-Fijian organization, that it was filed about six months late. Well, Your Honor, I think that you're aware that it was filed late. Under the general rule, yes, it was. You're not conceding timeliness by saying that. Thank you, Judge. Now, under the general rule that it must be filed calendar-wise within one year of having to enter the country, yes, that would operate as a late filing. Then he had his hearing before the IJ. Yes. And the IJ rendered an adverse decision. Yes. Turned him down. Right. All right. Then there was a notice of appeal filed. Correct. And who filed that? I did, Your Honor. All right. And did you then file a brief with the BIA? I did, Your Honor. Did you file it on time? I did not, Your Honor. My brother died at the same time that the brief was due. I know. But you filed it. You didn't file it on time. And the BIA wouldn't accept the brief. Right. And they affirmed the IJ. They did affirm the IJ. But I think one thing that's really interesting about it was the BIA didn't accept your brief. That is correct, Your Honor. All right. And then you prepared the brief on this appeal. I did, Your Honor. All right. Okay. Go ahead. I believe what's really interesting in the fact that the BIA did uphold the IJ's decision is that the government submitted a statement stating that it would not file a brief because it did not believe in the rationale of the immigration judge. They agreed with the outcome, but they did not believe with the rationale. And as we stand here before you today, there is neither the petitioner nor the government believes in the rationale of the immigration judge. And our position is, and it has been all along, that the IJ abused his discretion in denying the applicants the application for asylum. Getting back to your point, Judge, that there was a — that the general rule was that — and it's my understanding, of course, that there are some jurisdictional issues in whether or not this Court has jurisdiction to review that. I review the finding of the 1-year rule. I believe that the findings of the immigration judge are important because it shows the abuse of discretion throughout this analysis of the petitioner's case. First of all, if a petitioner is in status for 6 months, then the 1-year is told — the 1-year rule is told during that 6-month time period, and the regulations provide that they should apply for asylum within a reasonable time thereafter. So the question just becomes whether or not it was reasonable for him to have filed later on. That issue was never addressed by the immigration judge. Kennedy. Are you an attorney? I am, Your Honor. Licensed to practice in the State of Missouri? I am licensed to practice in the State of Missouri. Not in California? Not in California. And is it necessary for you to become certified by the Immigration Service? It is not necessary that I become certified by the Immigration Service, but I attend numerous CLEs. I'm a very active member of the American Immigration Lawyers Association. And if I were a member of the California Bar, I do believe that I would be certified as an immigration specialist. At the point in time you undertook Mr. Kumar's representation, you were aware or became aware of his history with these practitioners who turned out not to be lawyers, et cetera? The reputation of Mr. Albert Villela is very well known. I'm not trying to hurt or help you, and this is not one of those television interviews where you get to give the answer you want to give. I'd like to hear an answer to my question. I'm sorry, Judge. When you undertook the representation of Mr. Kumar, were you aware of his past dealings with these alleged practitioners? Yes or no? I have to think back on the exact time, Your Honor. In all honesty, my impression is, my recollection is that the petitions came to me right after their case was decided, and I initially had to get an appeal off immediately. Whether or not I did a comprehensive review of the case at that time, I do not believe so, because the transcript was not available at that time. Let me ask this question and see if I can get an answer. At the time you filed the brief with the BIA, whether it was timely or untimely, were you aware of Mr. Kumar's history with these people who purportedly represented him? Yes, Judge. Okay. And in your brief, did you raise the issue of ineffective assistance of counsel? My recollection is that I did raise the issue of ineffective assistance of counsel. However, given the fact that Mr. Villela is not an attorney, the Lozada requirements don't apply to persons that are not licensed attorneys, because the procedure is My question was simply, did you raise the issue before the BIA, or attempt to, with your brief? My recollection is that I did. My brief is right here in my briefcase. I can cross-check that, and I will bring that back up on rebuttal, Your Honor, if I can reserve time to respond. Go ahead. Did you tell the BIA, to your best recollection, did you tell the BIA about the history of how possibly your client had suffered with these prior, quote, representatives? I did not go into any history with respect to the other attorneys, but I do recall having — I believe that I did raise the issue with Mr. — with Mr. Villela, because that is where actually the delay did occur, is with Mr. Villela's representation in not filing his case in time. I think that the ineffective — Let me — let me — but you're aware that we have cases where we apply the doctrine of ineffective assistance of counsel to notorious. Are you aware of those cases? I'm not, Your Honor. I'm not aware of those cases. Well, we do that. We do that. Okay. And at the time that — at the time that you represented Mr. Kumar, were you aware that in the Asian Week, which is a newspaper, that the story went out on April the 20th, 2001, and the lead line was, Beware of Rogue Immigration Consultants, and a direct reference to the — to the Indo-Fijian organization? Judge, I have been very aware by my activities in the Bar of the concern by the Immigration Bar of notarios. I have assisted the Immigration Booster Center. I'm not talking about notarios. I'm talking about the — this particular service, the Indo-Fijian service. In August of — in April of 2001, I did not — No, no. When you — when you started to represent Mr. Kumar, were you aware of that? Not of this particular article, Your Honor. Well, you were aware that — of the problems that people encountered when they were represented by this Indo-Fijian organization. I was, Your Honor. I have represented several other clients. But you knew — you knew — you sort of felt like they were incompetent, didn't you? I did, Your Honor. Yeah. You didn't raise that — that issue. I believe I raised it in the BIA brief. And in my experience, Your Honor, with all due respect, I practiced primarily in the San Francisco — in the San — before the San Francisco Immigration Court. The judges there are — because it is in San Francisco, they are highly familiar with Mr. Villela. In fact, in the record, the petitioner even testified that the — he sought legal counsel because the asylum officer told him that he needed to find someone else and not stay with Mr. Villela. And he had his initial interview in the San Francisco Asylum Office. And the asylum officer was well aware of the problems that were — that — of Mr. Villela. It is quite common in our — in our bar that we are aware of it. We have been able to overcome many of those because the judges are familiar with it in the San Francisco — in the San Francisco Bay Area. I don't want to embarrass you, but do you know whether — whether or not you've come under any criticism by our staff in San Francisco on immigration matters? The staff of the Ninth Circuit Court of Appeals, Your Honor? Yes, my attorney, yes. I was just — I just attended the appellate — I'm just asking you. — training, Your Honor, at the end of October. I'm not aware of that at all. And I have — I'm very proud of my practice and my reputation before the Ninth Circuit. I have had — every course of case that I have presented before the judges here, I have prevailed on except for one. I was the attorney in Mohamed V. Gonzalez's case. I have — my first case was Salah v. Ashcroft. I prevailed in that case. Dumb v. Ashcroft was my case, which was a civil strife case, which I prevailed in that case. And I have — I'm — I'm very proud of the record that I have with the Ninth Circuit. It is not a perfect record, but I don't think any attorney has a perfect record. I was set for an oral argument tomorrow at the Ninth Circuit Court of Appeals where the Board of Immigration's — Board of Immigration, the government attorneys, had withdrawn that and asked for it to be remanded back to the BIA because my arguments were consistent with the law. And the — and the board finally recognized that they were in error and they convinced their client. I have had other cases where the — where the oil attorneys have asked to take their cases into mediation because of the arguments that I have advanced in their cases. And I do believe in this case, Your Honor, here at the Ninth Circuit, that this is another case where the government has said that it does not agree with the rationale of the immigration judge, where the immigration judge absolutely abused his discretion, where there's a lack of substantial evidence in the record. And these — these are the merits of this case. What was the name of the immigration judge? Mr. Fong. Fong, yeah. Fong, Judge Fong. Yeah. Yes. Okay. You've never been contacted by our appellate commissioner's office in San Francisco? Have I ever been contacted by the appellate commissioner's office? Yes. In what regard, Judge? What? In what regard? I just asked you. Have you ever been? I have one case where the case was filed one day late, and the court relieved me from the case. This was at the Ninth Circuit. And then the court — and the client took the case himself, and then the court sanctioned me $500, and then the court withdrew the sanction. Well, it didn't honor the sanction after I came back and told them that there was a complete error. Okay. Thanks. And that is — that is the only time that I'm aware of. And after I spoke with the attorneys and they recognized that there was a problem, then they — they said contact us, and there was — there was nothing else. I have not — there's been no complaint filed against me. There was no complaint filed against me in that case. I was basically a good Samaritan, where on my own I filed the case late. And the court did accept it. It was just basically because my messenger service did not get it there until — they said five minutes to 5. They said five minutes to 5. Well, you know, no good deed goes unpunished. I was not in violation in any rules of this court. Okay. Okay. And the court did not uphold any sanctions. All right. Good. You've satisfied me. So. I believe, Your Honor, that in this case, this case stands for itself on the law. Way over. Yeah. That's a — Why don't you just — you're over your time. I want to hear from the government on this case. Good morning. May it please the Court, my name is Marion Guyton. I'm with the U.S. Department of Justice. No, ma'am. You sit. Stay here. Stay here. Yeah. I'm representing the respondent, the Attorney General, in this matter. Yeah. Yeah. The first thing I want to comment on is Petitioner's Counsel's mischaracterization of the position of the Department of Homeland Security attorney in indicating, after the immigration judge's decision and the appeal was made to the Board of Immigration Appeals, what the DHS attorney said, as I recall, was that the immigration judge's decision was correct, but they did not necessarily agree with all of the rationale. That is not an indication that they found anything wrong. They simply were not ratifying everything. Except for reasons. Counsel didn't say they disagreed with the result. She said that they disagreed with the reasons. And I don't understand. No, they did not disagree with the reasons. They did not necessarily ratify the reasons. It's similar to a situation. It's very strange to say about your own case, I don't necessarily ratify the reasons. That certainly doesn't indicate an agreement with the reasons. Judge Reinhart, it's similar to in the summary affirmance decisions by the Board of Immigration Appeals where they affirm without opinion. What they do is they affirm the result of the decision of the immigration judge, but they're saying they do not necessarily ratify everything the immigration judge uses as a reason. You know, there are a lot of things you could talk about in this case, but it seems to me that that matter is simply a matter of how you look at it. Is the glass half empty or the glass half full? It does not affect the merits of the case. And I think you're wasting your valuable time, quite frankly, by talking about it. Let's get to the merits then. You're the one that's using your time to argue. We have an I-589 asylum application which was filed out of time. So that's off the table. Yeah, but it was filed by a certified representative. The government certified that representative, and the government had to know that that representative was incompetent. It was common knowledge in that area. It was in the papers. Now, what do you, this fellow that, Valila, you know, he goes under various names. I don't know whether you've done a search on him or not, but what training did he have? It's not part of the record. I know, but I'm asking you as a general matter. What training do these folks have? My knowledge of this case is confined, Judge Ferguson, to the record. How are they certified? Tell me that. How are they certified? What do they have to do to be certified? I don't have that information. But you know that a disbarred lawyer can practice before the immigration court. Is that right? If they have been admitted to practice before the immigration court. Can non-lawyers be certified to represent asylum seekers before the immigration judge, before the immigration court? No, Judge Hawkins. In other words, they have to be a lawyer. That is correct. Do they have to be a member in good standing of some bar? I believe that's the case. The bottom line here is the Congress has decided that the issue of the timeliness of the filing of an asylum application is outside of jurisdiction. You know, if you want my view, I think the government is complicit in all these miscarriages of justice that take place, because the government knows that we've got these folks out there that are in many ways incompetent, that don't follow the rules, that take people's money, that don't show up at hearings, that send lawyers in there that have never had a minute's time with their so-called clients, and they walk right in at the time of the hearing. We know that goes on, don't we? My knowledge of this case is just confined to the certified administrator record, Judge Brekus. Come on. How long have you been doing this for the Justice Department? Oh, I've been appearing before you for 11 1⁄2 years now. Have I gotten any sweeter? Not a bit. Not a bit, Your Honor. Well, I'm getting older, so I'm getting crankier. But, I mean, you know what goes on. Why don't you focus on the record of this case? Yeah, focus on it. Okay. But, Judge Brekus, I just wanted to say on that I-589 asylum application, whereas the statutory revisions precluded this Court's jurisdiction, the REAL ID Act that you mentioned restored limited jurisdiction to the Court to discuss constitutional questions and questions of law. Constitutional issues, yeah. And ineffective assistance of counsel is a constitutional issue. However, the immigration judge was aware of the situation. He discussed it extensively in an extensive decision, 27 pages. And what judge is this? Judge Fong, Judge Tucker Fong. Judge Fong, yeah, and he's number two guy in the system right now, isn't he? I don't know. Yeah, well, I think he is. But he was aware of the situation. But we've got- He discussed it. We've got a number of cases where our judges have jumped on him for the way he conducts his hearings. And so he's not unfamiliar to us. Well, if we take asylum off the table, we're left with, well, let's go to the CAF claim. Why take asylum off the table? Because he failed to file his asylum application within a one-year time period, and he provided no extraordinary circumstances for his failure to do so. Well, because it wasn't done by some, by an organization and a person, Albert A. Valila, that the Department of Justice calls a certified representative. You know, Craigson, once again, the court is, the immigration judge looked at that. He made a determination. This Court may not agree with that determination, but the Congress took that out of this Court's jurisdiction. Not ineffective assistance of counsel. And that doctrine applies to people like Valila. Let's assume there was a timely filing, and there had been a hearing, and the same result had obtained, and there was a timely appeal to the BIA. First of all, on those assumptions, does the BIA recognize a claim of ineffective assistance of counsel where the work below at the immigration judge level was done by a non-lawyer? Notario, yes. That is correct. In other words, in the BIA world, in its case law, they can, they're capable of recognizing a claim for IAC where the advice was actually by a non-lawyer. Yes, Judge Hawkins. Matter of the Lozada is the case, is a board case that requires that the offending attorney on Notario be notified and given an opportunity. I think we're familiar with the Lozada requirements. They're now part of the regulations, aren't they? Yes. Okay. So that's a possibility that can be raised at the BIA level. A new attorney could come in for a petitioner and say, here's what happened to my client and was demonstrably ineffective. And the BIA is capable of recognizing that and acting on it. A motion to reopen could be filed before the BIA, Judge Hawkins, but that is within the broad discretion of the board to grant or deny. Sure. Okay. And do I understand correctly in this case that the immigration judge addressed not only the jurisdictional issue, but made some findings about credibility? That's correct. And then even assuming that the petitioner was credible, made a determination that an insufficient showing had been made to justify assault? That is correct. We refer to that as alternative finding, even if he had found them credible. Let me ask you a question about that. Do you view the findings as making alternative findings on the merits of the asylum claim, or do you view those findings as relating only to withholding and the CAT claim? Only withholding and the CAT claim, because as I indicated earlier, asylum was off the table. Asylum was off the table, as you said. So the immigration judge was just looking at the withholding and the CAT claim. He did not reach the merits of the asylum claim. His language would appear to discuss it, but I think he was only referring to the withholding and the CAT claim. Thank you. But I think the torture convention claim is absurd on its face. There was no indication of torture. Nothing happened to him, even rose to the level of persecution, let alone torture. Well, they beat him up, didn't they? Didn't he get a little beaten up? I mean, look, this is on the beautiful island of Fiji, huh? And all the land there is owned communally by the Fijians. And the East Indians, they came over there for a dollar a day to cut down the sugarcane. And now their population is probably a little bigger than the Fijians. And so when the East Indians, as we know, elected a majority in the parliament and were in charge of the government, we know there was a big coup by the army, and this goes on over there. And so it's a Fijian army. They control the land, and the Indo-Fijians have been manhandled for some time. So he goes in there. He gets arrested because there was a curfew. He had to get his cow and bring his cow to the barn that was out there. And they take him into the jail, and they rough him up pretty good. And then he's a Hindu, right? That's correct. And they force meat down his throat. That's what he alleged. Well, that's what he alleged, yeah. But did he establish that? The immigration judge felt he didn't. Well, he felt he didn't what? He did not establish the specific incidents of. How is he going to establish that except that that's what he said that's what happened to him? Is he going to get the person that jammed the meat down his throat? But in order to carry his burden, he has to present testimony that is consistent and believable. The immigration judge didn't believe it and gave the reasons. And he listed several incidents that indicate to him that it was not credible. Well, assuming his testimony, just assume that hypothetically that his testimony was credible on an incident like Judge Ferguson described, does he have to offer more than his own testimony? Corroboration is expected if it can be produced. And the immigration judge in this case felt that he did not establish why this corroborative evidence was not introduced or he can establish that it's not easily obtainable. And then you don't have to require corroboration. How is he going to do that, get the Fijian police officers or authorities to find out who it was that rammed it down his throat and beat him up? Well, he produced no evidence of any medical treatments. And the immigration judge felt that he still had relatives in Fiji. He could have resorted to contacting his relatives to try to come up with corroborative documentation, which he did not do. But they weren't there when it was done. It's not like Abu Ghraib where we have people taking pictures, right? And his religion forbids him to eat meat. That's right, isn't it? That's correct. Okay. And so this was a pretty vile thing to do to him. But the immigration judge felt that it did not rise to the level of persecution. He did not condone in his decision. He indicated he did not condone that mistreatment. However, he did not feel it rose to the level of persecution under that. And in answer to Judge Hawkins' question, if we are to accept this testimony as credible, there's a question as to whether or not what happened, the mistreatment that Mr. Kumar suffered in his native country rose to the level of persecution, or was it merely discrimination? And then wasn't there an incident when they went into his house and they threatened to rape his wife? In 1996. Yeah, and she screamed and the neighbors came with knives and they ran away. But once again, Judge Ferguson, the immigration judge, discounted that because he indicated that while the wife testified to that, Mr. Kumar never testified to it, nor did he mention it in his declaration. And the immigration judge found this particularly noteworthy. Who filled out Kumar's declaration? It's not his handwriting, is it? It's this other guy, Albert A. Valilla, who filled it out. Kumar doesn't speak English, does he? You had to have an interpreter there at the hearing. Does he write in English? Well, that's related, Judge Ferguson, to the declaration. What about his testimony at the hearing? He didn't bring it up. And then when he was asked about it, he said, well, no one asked him about it. And this is something that's so traumatic, you would think that this was the first thing he would bring up. Well, you'd think, yeah, if it were you or I who were there. But you've got here, you've got a guy that's a laborer from Fiji. He's uneducated. He doesn't speak our language. You know, he goes to one of these folks, comes in there and represents him. He didn't fill that out. He signed his name, but he doesn't know how to read English. That's why he had an interpreter there. Wasn't there an interpreter there? Yes. Okay. Well, at bottom, the government would maintain that substantial evidence does support the immigration judge's decision and that there is no compelling reason for overturning the immigration judge's decision. All right. Don't give her too much time. We'll give you a minute for rebuttal. Thank you, Judge. I just wanted to follow up on the judge's question regarding the issue on ineffective assistance of counsel. And on page 13 of the Respondent's Brief that was filed before the BIA, there was a discussion of Lozada and the fact that because he was not a licensed attorney, that it was not operative. However, in the next paragraph, I refer to Rodriguez-Lawrence to support that whether someone relies on a fraudulent non-attorney, then equitable factors should be, the statute should be told, and the equity should be leaned in the favor of the petitioner. So I just wanted to bring that back to the Court to clarify on that one point. I have raised ineffective assistance of counsel in many cases in the past. And fortunately, the frustration that I see with this Court today, with the immigration bar, is the same frustration that the immigration bar has in trying to constantly advance and get a hearing on allegations of ineffective assistance of counsel, which is really quite rare. In fact, since I've been practicing, I have yet to see, other than this Court, make any rulings with respect to ineffective assistance of counsel, either with certified representatives or licensed attorneys. But just to go back to the basic arguments in this case, I just want to remind the Court that we believe that the legal, that there is a lack of substantial evidence in the record to uphold the credibility assessment or the credibility findings in this case, and that the judge abused his discretion in denying the asylum claim of the petitioner. Now, because we are here, and technically under the jurisdictional issues, we have, I argued the cap and the withholding primarily. I did give the asylum argument just so that the Court could see where the lack of, where the evidence was not substantial. Assuming that the Court does not have the jurisdiction over the one-year bar based on the statute,  and that rationale should be applied to withholding and cap, in this circumstance, we believe that the Respondent obviously has shown that he was a member of a disfavored group, that he had been subjected to, we believe, past persecution when he was in Fiji, both by ethnic Fijians and then, again, the eating of the beef in the prison, we believe rises to the level of torture and would constitute past persecution. And we'd like to see the Court extend that reasoning upside hell, because we believe that the situation of the Fijians in, strike that, the Indo-Fijians actually in Fiji is quite analogous and comparable to the situation of the Chinese in Indonesia. Kennedy. All right. Thank you. Thank you, Your Honor. I want to just ask counsel for the government a question. You thought you were home free, didn't you? No, I just, you know, I mean, we're all friends here. We all want to do the right thing, don't we? That's correct. And you've got to be upset a little bit about these immigration laws that we have, a little bit, you know. It's not my position. I'm not an elected member of government. Yeah, but things are changing, you know. So what? Let me just say this, Judge Ferguson. I know. Our mantra in our office is that our responsibility is to protect and defend the authority of the executive to carry out the immigration policy of this country. Okay. Well, that's all right. That's your mantra? Is that what you said, your mantra? Yes, sir. So when you want to go to sleep, you repeat that? I don't remember that. Here's the only thing I want to ask you. Would you agree that our immigration laws are very, very complex? Yes, I would. Would you agree that they're almost as complex as our Internal Revenue Code? I think it's second only to the IRS Code, yes. Yeah, and probably third to our sentencing guidelines. Huh? Something like that. I know you don't deal in those. So what bothers me is we've got this very complex area of the law that keeps changing, you know. Every time there's something that happens that might be favorable, then we get another law that blocks that avenue. We've got time limits on this and time limits on that and time limits on that. And we have a manual. You could get it on our website on immigration law. We've got a staff of about 40, 50 lawyers that work on these, not just this. But we work on them a lot now because last year or so, we only had 800 immigration cases. Now we've got 8,000 because the Justice Department had such great faith in us, they just dumped all these cases on us. They just affirmed, you know. So that's how we got them. But, Gary, we've got a bunch of other cases to deal with. Yeah, we've got a bunch of other cases, and I don't want to give too many speeches. But I kind of like you, and you're a good audience. So, okay. God save the United States. Thank you. All right. Three. Rodriguez versus Gonzalez. Oh, boy. Thank you.
judges: Pregerson, Reinhardt, Hawkins